## IN THE UNITED STATES DISTRICT COURT FOR THE

## DISTRICT OF COLUMBIA

| | |
|---|---|
| MEMORIAL SLOAN-KETTERING CANCER CENTER<br>1275 York Avenue<br>New York, NY 10021<br><br>        Plaintiff,<br><br>  v.<br><br>HON. DAVID KAPPOS<br>Under Secretary of Commerce for Intellectual Property<br>and Director of the United States Patent and Trademark<br>Office<br>Office of the General Counsel<br>United States Patent and Trademark Office<br>600 Dulaney Street<br>Arlington, VA 22314<br><br>        Defendant. | Civil Action No. _____ |

## COMPLAINT

Plaintiff Memorial Sloan-Kettering Cancer Center, for its Complaint against the Honorable David Kappos, states as follows:

1.    This is an action by the owner of U.S. Patent No. 7,541,179 ("the '179 patent") seeking review of inaccurate and erroneous patent term adjustment calculations made by the United States Patent and Trademark Office ("USPTO"). Specifically, this is an action by Plaintiff under 35 U.S.C. § 154(b)(4)(A) seeking a judgment that the patent term adjustment of 431 days calculated by the USPTO for the '179 patent should be corrected to 683 days.

2.    This action arises under 35 U.S.C. § 154 and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

## THE PARTIES

3.      Plaintiff Memorial Sloan-Kettering Cancer Center is a corporation organized under the laws of the state of New York and having a principal place of business at 1275 York Avenue, New York, NY 10021.

4.      Defendant David Kappos is the Under Secretary of Commerce for Intellectual Property and Director of the USPTO, acting in his official capacity.   The Director of the USPTO ("Director") is responsible for superintending or performing all duties required by law with respect to the granting and issuing of patents, and is designated by 35 U.S.C. § 154(b)(3)(B) as the official responsible for determining the period of patent term adjustment.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action and is authorized to issue the requested relief to Plaintiff pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1361, 35 U.S.C. § 154(b)(4)(A) and 5 U.S.C. §§ 701-706.

6.      Venue is proper in this district by virtue of 35 U.S.C. § 154(b)(4)(A).

7.      This Complaint is timely filed in accordance with 35 U.S.C. § 154(b)(4)(A).

## FACTS

8.      On June 2, 2009, the USPTO issued the '179 patent to Plaintiff based on U.S. Patent Application Serial No. 10/188,221, entitled "Vector Encoding Human Globin Gene And Use Thereof In Treatment Of Hemoglobinopathies," and filed on July 1, 2002 by Michel Sadelain, Stefano Rivella, Chad May and Joseph Bertino.  A true copy of the '179 patent is attached hereto as Exhibit 1.

9.      Plaintiff Memorial Sloan-Kettering Cancer Center is the assignee and owner of the '179 patent as evidenced by an assignment executed by Michel Sadelain, Stefano Rivella, Chad May

and Joseph Bertino and recorded with the USPTO at Reel 013256, Frame 0983 of the USPTO assignment records.   Plaintiff Memorial Sloan-Kettering Cancer Center is the real party in interest in this case.

10.     Pursuant to 35 U.S.C. § 154, the Director is required to grant a patent term adjustment in accordance with the provisions of 35 U.S.C. § 154(b).  Specifically, 35 U.S.C. § 154(b)(3)(D) states that "[t]he Director shall proceed to grant the patent after completion of the Director's determination of a patent term adjustment under the procedures established under this subsection, notwithstanding any appeal taken by the applicant of such determination."

11.     In calculating the patent term adjustment, the Director is required to consider USPTO delays under 35 U.S.C. § 154(b)(1)(A) and (B), any overlapping periods in the USPTO delays under 35 U.S.C. § 154(b)(2)(A), and any applicant delays under 35 U.S.C. § 154(b)(2)(C).

12.     The patent term adjustment for the '179 patent, as determined by the Defendant under 35 U.S.C. § 154(b) and listed on the face of the '179 patent, is 431 days.  *See* Exhibit 1 at 1.

13.     Had the USPTO calculated the patent term adjustment properly, the '179 patent would be entitled to 683 days of patent term adjustment.

14.     The errors in the USPTO's patent term adjustment calculation are detailed in a recent decision from this Court in *Wyeth v. Dudas*, 580 F. Supp. 2d 138, 88 U.S.P.Q.2d 1538 (BNA) (D.D.C. 2008), *argued*, No. 2009-1120 (Fed. Cir. Oct. 7, 2009), where this Court granted summary judgment against the USPTO holding that the USPTO's patent term adjustment calculation methodology was erroneous as a matter of law and inconsistent with the 35 U.S.C. § 154.  A true copy of the *Wyeth v. Dudas* opinion is attached hereto as Exhibit 2.

15.     The correct patent term adjustment methodology identified in the *Wyeth v. Dudas* decision governs the USPTO's calculation of patent term adjustment for the Plaintiff's '179 patent.

## **CLAIM FOR RELIEF**

16.     The allegations of paragraphs 1-15 are incorporated in this claim for relief as if fully set forth herein.

17.     During prosecution of the '179 patent, Plaintiff accrued 252 days of patent term adjustment under 35 U.S.C. § 154(b)(1)(A), and accrued 803 days of patent term adjustment under 35 U.S.C. § 154(b)(1)(B).

18.     Under the USPTO's interpretation of 35 U.S.C. § 154, all patent term adjustment accrued under 35 U.S.C. § 154(b)(1)(A) and 35 U.S.C. § 154(b)(1)(B) inherently overlaps and, thus, it has been the USPTO's position that a patent holder is only eligible for the larger of these two amounts of patent term adjustment, that is, 803 days for the '179 patent (less any deductions for applicant delay).

19.     In view of the recent decision from this Court in *Wyeth v. Dudas*, the USPTO is obligated to award patent term adjustment under both 35 U.S.C. § 154(b)(1)(A) and 35 U.S.C. § 154(b)(1)(B) except where both delays occur on the same day, in which case the applicant is awarded a single day of patent term adjustment.

20.     Plaintiff agrees with the USPTO's calculation of 252 days of "A Delay" under 35 U.S.C. § 154(b)(1)(A).

21.     Plaintiff respectfully asserts that USPTO erred in not awarding the full 803 days "B Delay" under 35 U.S.C. § 154(b)(1)(B) for the failure of the USPTO to issue the '179 patent on or before July 1, 2005 (three years after the filing date).  Specifically, Plaintiff is entitled to all of

the 803 days of patent term adjustment for the period between July 2, 2005 (three years and one

day after the application filing date) and September 12, 2007 (the date on which a Request for

Continued Examination ("RCE") was filed).

22.     The 252 days of "A Delay" and the 803 days of "B Delay" do not overlap as depicted

below:



23.     Under the proper analysis set forth in *Wyeth v. Dudas* and as reflected in the above-

diagram, Plaintiff is entitled to 683 days of patent term adjustment calculated as follows:

     a.   252 days of "A Delay,"

     b.   plus 803 days of "B Delay,"

     c.   less 0 days of overlap between the periods of "A Delay" and "B Delay," and

     d.   less 372 days of applicant delay.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

(a)    issue an Order changing the period of patent term adjustment for the '179 patent

from 431 days to 683 days and requiring Defendant to issue a Certificate of Correction to alter

the terms of '179 patent to reflect the corrected 683 days of patent term adjustment; and

(b)    grant such other and further relief as the nature of the case may admit or require

and as may be just and equitable.

Date:  December  2   , 2009          Respectfully submitted,

**EDWARDS ANGELL PALMER & DODGE LLP**

Brian M. Gaff (Bar No. TX0049)
111 Huntington Avenue
Boston, MA  02199-7613
(617) 239-0100
(617) 227-4420 (fax)

James E. Armstrong, IV (Bar No. 460470)
1875 Eye Street, NW
Washington, DC 20006-5421
(202) 478-7370
(202) 478-7380 (fax)

Of counsel:
Brian R. Landry
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA  02199-7613
(617) 239-0100
(617) 227-4420 (fax)

*Attorneys for Plaintiff Memorial Sloan-Kettering
Cancer Center*

**EXHIBIT 1**

US007541179B2

(12) **United States Patent**
Sadelain et al.

(10) Patent No.: **US 7,541,179 B2**
(45) **Date of Patent:** **Jun. 2, 2009**

(54) **VECTOR ENCODING HUMAN GLOBIN GENE AND USE THEREOF IN TREATMENT OF HEMOGLOBINOPATHIES**

(75) Inventors: **Michel Sadelain**, New York, NY (US); **Stefano Rivella**, New York, NY (US); **Chad May**, New York, NY (US); **Joseph Bertino**, New York, NY (US)

(73) Assignee: **Memorial Sloan-Kettering Cancer Center**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 431 days.

(21) Appl. No.: **10/188,221**

(22) Filed: **Jul. 1, 2002**

(65) **Prior Publication Data**

US 2003/0022303 A1    Jan. 30, 2003

**Related U.S. Application Data**

(60) Provisional application No. 60/301,861, filed on Jun. 29, 2001, provisional application No. 60/302,852, filed on Jul. 2, 2001.

(51) **Int. Cl.**
| | |
|---|---|
| *C12N 15/00* | (2006.01) |
| *C12N 15/10* | (2006.01) |
| *C12N 15/67* | (2006.01) |
| *C12N 7/01* | (2006.01) |

(52) **U.S. Cl.** .................. 435/320.1; 435/69.1; 536/24.1; 536/24.2; 424/93.2

(58) **Field of Classification Search** ............... 435/320.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,126,260 | A | 6/1992 | Tuan et al. |
| 5,610,053 | A | 3/1997 | Chung et al. ............. 435/172.3 |
| 5,631,162 | A * | 5/1997 | LeBoulch et al. ........ 435/320.1 |
| 5,834,256 | A | 11/1998 | Finer et al. |
| 5,858,740 | A | 1/1999 | Finer et al. |
| 5,981,276 | A | 11/1999 | Sodroski et al. |
| 5,994,136 | A | 11/1999 | Naldini et al. |
| 6,013,516 | A | 1/2000 | Verma et al. |
| 6,090,608 | A | 7/2000 | Oppenheim et al. ...... 435/235.1 |
| 6,110,666 | A * | 8/2000 | Grosveld et al. .............. 435/6 |
| 6,218,187 | B1 | 4/2001 | Finer et al. |
| 6,294,165 | B1 | 9/2001 | Lever et al. |
| 6,312,682 | B1 | 11/2001 | Kingsman et al. |
| 6,428,953 | B1 | 8/2002 | Naldini et al. |
| 6,444,421 | B1 * | 9/2002 | Chung ........................... 435/6 |
| 6,524,851 | B1 * | 2/2003 | Ellis ........................... 435/325 |
| 6,544,771 | B1 | 4/2003 | Rivière et al. |
| 6,642,043 | B1 * | 11/2003 | Bertino et al. ........... 435/252.3 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 97/33988 | 9/1997 |

OTHER PUBLICATIONS

Sorrentino et al, Localization and characterization of the DNase I-hypersensitive site II (HS II) enhancer. A critical regulatory element within the beta-globin locus-activating region, Ann NY Acad Sci, 1990;612:141-51.*

Collis et al, Definition of the minimal requirements within the human beta-globin gene and the dominant control region for high level expression, EMBO J, Jan. 1990;9(1):233-40.*

Molete et al, Sequences flanking hypersensitive sites of the beta-globin locus control region are required for synergistic enhancement, MCB, May 2001;21(9):2969-80.*

Genbank NG-000007, priority date Jun. 19, 2006, downloaded Jul. 24, 2006.*

NG_000007 (GI:13907843), *Homo sapiens* genomic beta globin region on chromosome 11, U.S. National Library of Medicine, Bethesda, MD, USA, May 2001, accessed by PTO on Mar. 2, 2007.*

Ryan et al, A single erythroid-specific DNAse I super-hypersensitive site activates high levels of human b-globin gene expression in transgenic mice, Genes and Development, vol. 3, pp. 314-323; see entire document).*

Melton et al, Stability of HPRT marker gene expression at different gene-targeted loci: observing and overcoming a position effect, Nucleic Acids Research, 1997, vol. 25, No. 19 3937-3943.*

Dzierzak et al., Lineage-specific expression of a human β-globin gene in murine bone marrow transplant recipients reconstituted with retrovirus-transduced stem cells., 1988, pp. 35-41, vol. 331.

Kalberer et al., Preselection of retrovirally transduced bone marrow avoids subsequent stem cell gene silencing and age-dependent extinction of expression of human β-globin in engrafted mice, PNAS, 2000, pp. 5411-5415, vol. 97, No. 10,

May et al., Successful treatment of murine β-thalassemia intermedia by transfer of the human β-globin gene, Blood, 2002, pp. 1902-1908, vol. 99, No. 6.

Raftopoulos et al., Long-Term Transfer and Expression of the Human β-Globin Gene in a Mouse Transplant Model, Blood, 1997, pp. 3414-3422, vol. 90, No. 9.

(Continued)

*Primary Examiner*—Maria Marvich
(74) *Attorney, Agent, or Firm*—Edwards Angell Palmer & Dodge LLP; Peter C. Lauro, Esq.

(57) **ABSTRACT**

Recombinant lentiviral vectors having a region encoding a functional β-globin gene; and large portions of the β-globin locus control regions which include DNase I hypersensitive sites HS2, HS3 and HS4 provides expression of β-globin when introduced into a mammal, for example a human, in vivo. Optionally, the vector further includes a region encoding a dihydrofolate reductase. The vector may be used in treatment of hemoglobinopathies, including β-thalassemia and sickle-cell disease. For example, hematopoietic progenitor or stem cells may be transformed ex vivo and then restored to the patient. Selection processes may be used to increase the percentage of transformed cells in the returned population. For example, a selection marker which makes transformed cells more drug resistant than un-transformed cells allows selection by treatment of the cells with the corresponding drug.

**24 Claims, 4 Drawing Sheets**

# US 7,541,179 B2
Page 2

## OTHER PUBLICATIONS

Rivella et al., Genetic Treatment of Severe Hemoglobinopathies: The Combat Against Transgene Variegation and Transgene Silencing, Seminars in Hematology, 1998, pp. 112-125, vol. 35, No. 2.

Sabatino et al., Long-term expression of γ-globin mRNA in mouse erythrocytes from retrovirus vectors containing the human γ-globin gene . . . , PNAS, 2000, pp. 13294-13299, vol. 97, No. 24.

Dull et al. (1998) J. Virol. 72:8463-8471, "A Third-Generation Lentivirus Vector with a Conditional Packaging System".

Naldini et al. (1996) Science 272:263-267, "In Vivo Gene Delivery and Stable Transduction of Nondividing Cells by a Lentiviral Vector".

Sadelain et al. (1995) Proc. Natl. Acad. Sci. 92:6728-6732, "Generation of a high-titer retroviral vector capable of expressing high levels of the human β-globin gene".

Zufferey et al., "Self-Inactivating Lentivirus Vector for Safe and Efficient In Vivo Gene Delivery", Journal of Virology, Dec. 1998, vol. 72, No. 12, pp. 9873-9880.

Gatlin et al. "In Vitro Selection of Lentivirus Vector-Transduced Human CD34+ Cells." Human Gene Therapy 11: 1949-1957 (2000).

Sadelain "Genetic Treatment of the Haemogloinopathies Recombinations and New Combinations." British Journal of Haematology 98: 247-253 (1997).

Tisdale et al. "Towards Gene Therapy of Disorders of Golbin Synthesis." Seminars in Hematology 38:4 382-392 (2001).

Rivella et al. "Globin Gene Transfer: a Paradigm for Transgenic Regulation and Vector Safety." Gene Therapy and Regulation 00:0; 1-27 (2003).

Sadelain et al. Issues in the Manufacture and Transplantation of Genetically Modified Hematopoietic Stem Cells. Current Opinion in Hematology 7: 364-377 (2000).

Huang. et al., "Nonadditivity of Mutational Effects at the Folate Binding Site of *Escherichia coli* Dihydrofolate Reductase", *Biochemistry*, vol. 33, No. 38, pp. 11576-11585, 1994.

Ercikan et al., "Effect of codon 22 mutations on substrate and inhibitor binding for human dihydrofolate reductase", *Chemistry and Biology of Pteridines and Folates*, pp. 515-519, 1993.

May, et al., "Therapeutic haemoglobin synthesis in β-thalassaemic mice expressing lentivirus-encoded human β-globin", *Nature*, vol. 406, pp. 82-86, Jul. 6, 2000.

D. Bodine, "Globin Gene Therapy: One (Seemingly) Small Vector Change, One Giant Leap in Optimism", *Molecular Therapy*, vol. 2, No. 2, pp. 101-102, Aug. 2000.

* cited by examiner



**Fig. 1**

# Clinical Use of Drug Resistance

## In Vivo Selection of Genetically Modified Stem Cells



**Fig. 2**



**Fig. 3**



**Fig. 4**



**Fig. 5 A**

**Fig. 5 B**



**Fig. 6**

US 7,541,179 B2

1

# VECTOR ENCODING HUMAN GLOBIN GENE AND USE THEREOF IN TREATMENT OF HEMOGLOBINOPATHIES

## STATEMENT CONCERNING RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Application No. 60/301,861 filed Jun. 29, 2001 and U.S. Provisional Application No. 60/302,852 filed Jul. 2, 2001, both of which are incorporated herein by reference.

## STATEMENT CONCERNING GOVERNMENT FUNDING

This application was supported by funds provided under NHLBI grant No. HL57612. The United States government may have certain rights in the invention.

## BACKGROUND OF THE INVENTION

This application relates to a vector comprising a mammalian, and particularly a human globin gene and to the use thereof in treatment of hemoglobinopathies, including α- and β-thalassemia and sickle-cell disease.

Current treatment modalities for β-thalassemias consist of either red blood cell transfusion plus iron chelation (which extends survival but is cumbersome, expensive and an imperfect therapy), or allogeneic bone marrow transplant (which carries a lethal risk and is not available to the majority of patients). Thus, there is a substantial need for improved therapeutic approaches. The present invention provides a genetic correction in autologous hematopoietic stem cells, thus using gene therapy to provide a less-risky and more effective long-term treatment.

While gene therapy has been proposed for many years, a significant challenge facing efforts to develop gene therapy vectors is the ability to produce therapeutically useful levels of a desired protein or peptide. The present invention provides a vector which is capable of providing therapeutically meaningful levels of human globin for sustained periods of time. This ability arises from the ability to transmit large genomic regulatory sequences that control expression of the therapeutic gene.

## SUMMARY OF THE INVENTION

In accordance with the invention, a recombinant lentiviral vector is provided comprising:
(a) a region comprising a functional globin gene; and
(b) large portions of the β-globin locus control regions which include large portions of DNase I hypersensitive sites HS2, HS3 and HS4. The regions may be the complete site or some lesser site which provides the same functionality as the specific sequences set forth below. This vector provides expression of β-globin when introduced into a mammal, for example a human, in vivo. Optionally, the vector further comprises a region encoding a dihydrofolate reductase.

By incorporation of different globin genes, the vector of the invention may be used in treatment of hemoglobinopathies, including α- and β-thalassemia and sickle-cell disease. For example, hematopoietic progenitor or stem cells may be transformed ex vivo and then restored to the patient. Selection processes may be used to increase the percentage of transformed cells in the returned population. For example, a selection marker which makes transformed cells more drug resis-

2

tant than un-transformed cells allows selection by treatment of the cells with the corresponding drug. Selection and/or enrichment may also be carried out in vivo, for example using methotrexate or similar antifolates to select for cells rendered resistant by the expression from the vector of a dihydrofolate reductase (DHFR).

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows the genomic structure of a recombinant onco-retroviral vector in accordance with the invention.

FIG. 2 shows the genomic structure of recombinant onco-retroviral vector within the scope of the invention.

FIG. 3 shows experimental results demonstrating increased mean β-globin expression in transduced MEL cells.

FIG. 4 shows the average vector copy number in peripheral blood cells, measured periodically for 24 weeks, which confirms highly efficient gene transfer in cells transduced with the vector of the invention.

FIGS. 5A and B show human β-globin expression per endogenous allele 12 days and 22 weeks after introduction of cells transduced with the vector of the invention.

FIG. 6 shows haematocrit level, red blood cell count, reticulocyte count and haemoglobin level fifteen weeks after transplantation with unselected TNS9-transduced Hbb$^{th3/+}$ bone marrow.

## DETAILED DESCRIPTION OF THE INVENTION

In a first aspect of the present invention, a recombinant lentiviral vector is provided comprising:
(a) a region comprising a functional globin gene; and
(b) large portions of the β-globin locus control regions, which include DNase I hypersensitive sites HS2, HS3 and HS4.

As used in the specification and claims hereof, the term "recombinant lentiviral vector" refers to an artificially created polynucleotide vector assembled from a lentiviral-vector and a plurality of additional segments as a result of human intervention and manipulation.

The term "functional globin gene" refers to a nucleotide sequence the expression of which leads to a globin that does not produce a hemoglobinopathy phenotype, and which is effective to provide therapeutic benefits to an individual with a defective globin gene. The functional globin gene may encode a wild-type globin appropriate for a mammalian individual to be treated, or it may be a mutant form of globin, preferably one which provides for superior properties, for example superior oxygen transport properties. The functional globin gene includes both exons and introns, as well as globin promoters and splice doners/acceptors. Suitably, the globin gene may encode α-globin, β-globin, or γ-globin. β-globin promoters may be sued with each of the globin genes.

The recombinant vectors of the invention also include large portions of the locus control region (LCR) which include DNase I hypersensitive sites HS2, HS3 and HS4. In prior studies, smaller nucleotide fragments spanning the core portions of HS2, HS3 and HS4 have been utilized. Sadelain et al. *Proc. Nat'l Acad. Sci. (USA)* 92: 6728-6732 (1995); Lebouich et al., *EMBO J.* 13: 3065-3076 (1994). The term "large portions" refers to portions of the locus control region which encompass larger portions of the hypersensitive sites as opposed to previously tested fragments including only the core elements. The regions may be the complete site or some lesser site which provides the same functionality as the specific sequences set forth below. In preferred embodiments of the invention, the large portions of the locus control regions

US 7,541,179 B2

3

are assembled from multiple fragments, each spanning one of the DNase I hypersensitive sites. In addition, the locus control region has two introduced GATA-1 binding sites at the junction between HS3 and HS4. While not intending to be bound by any specific mechanism, it is believed that the incorporation of these transcription factor binding sites enhances the effectiveness of the vector.

The genomic structure of one embodiment of the vector of the invention (TNS9) is shown in FIG. 1. TNS9 incorporates human β-globin gene (from position –618 to +2484) that includes an extended promoter sequence and a 3'-enhancer element. Optionally, a portion of 3'U3 region of the lentiviral backbone can be deleted for increased safety. In FIG. 1, the exons and introns of the human β-globin gene are represented by filled and open boxes, The locations are indicated for the splice donor (SD), splice acceptor (SA), packaging signal (Ψ), rev-response element (RRE), human β-globin promoter (P) and 3'-β-globin enhancer (E). Thus, in the vector TNS9, a functional β-globin gene, which includes both the exons and introns of the gene and the relevant control sequences from the human β-globin locus. These are combined with the large fragments of the locus control region. The 3.2 kb LCR assembled into dTNS9 consists of an 840 bp HS2 fragment (SnaBI-BstXI), a 1308 bp HS3 fragment (HindIII-BamHI) and a 1069 bp HS4 fragment (BamHI-BanII).

In a further aspect of the invention, the β-globin gene coding sequence can be exchanged and replaced with either the gamma globin gene (for sickle cell disease) or the alpha globin gene (for alpha-thalassemias). In one strategy, a NcoI-PstI fragment of the β-globin gene is replaced with the corresponding NcoI-HindIII fragment of the gamma globin gene or the NcoI-PstI fragment of the human alpha globin gene. These fragments start at the translational start of each globin gene (spanning the NcoI site) and end past their respective polyadenylation signals. In the second strategy, chimeric genes can be generated by only swapping the coding sequence of each one of the three exons of these genes. Thus, for the gamma globin gene, the result is a vector that comprises the beta globin promoter, the beta globin 5' untranslated region, the gamma exon 1 coding region, the gamma intron 1 the gamma exon 2, the beta intron 2, the gamma exon 3, and the beta 3' untranslated region. Thus all the elements of the TNS9 vector remain in place (promoter, enhancers, 5' and 3' untranslated regions, the LCR elements, the 2 additional GATA-1 binding sites and the introns of the beta globin gene (at least intron 2, which is most important). In a third strategy, the codon usage within exon 3 of the gamma globin gene can be modified so that its sequence will resemble as much as possible that of the beta globin gene. The reason for testing this is that the beta globin gene is always the best expressed.

Additional elements may be included in the vectors of the invention to facilitate utilization of the vector in therapy. For example, the vector may include selectable markers, to confirm the expression of the vector or to provide a basis for selection of transformed cells over untransformed cells, or control markers which allow targeted disruption of transformed cells, and thus the selective removal of such cells should termination of therapy become necessary.

In a further specific embodiment, the vector of the invention includes the mouse PGK promotor and human dihydrofolate reductase (DHFR) cDNA as a transcriptional unit. Mutant forms of DHFR which increase the capacity of the DHFR to confer resistance to drugs such as methotrexate are suitably used. For example, single and double mutants of DHFR with mutations at amino acids 22 and 31 as described

4

in commonly assigned PCT Publication No. WO 97/33988, which is incorporated herein by reference, may be advantageously utilized.

FIG. 2 shows the genomic structure of specific vector within the scope of the invention. The vector includes a deleted LTR, from –456 to –9 of HIV LTR and the PGK promoter (530 bp) from the murine phosphoglycerate kinase 1 gene. It also includes a DHFR-encoding region encoding human DHFR with s/f mutation at amino acid 22. The locus control region and the β-globin region are the same as in TSN9. This vector is designated dTNS9-PD. This incorporation of DHFR into this vector provides transformed cells with a methotrexate-resistant phenotype. As a result, methotrexate, and other antifolates can be used, both in vitro and in vivo as a selection tool to enhance levels of the functional hemoglobin. When hematopoietic stem cells were transformed using dTNS9-PD and reintroduced to mice that were then treated with NMBPR-P (0.5 mg/dose) and TMTX (0.5 mg dose) for five days, observed levels of expressed human β-globin were much higher in mice transduced with dTNS9-PD vectors after treatment with TMTX and NMBPR-P for selection of transduced cells.

The vectors of the invention are useful in therapy for treatment of individuals suffering from hemoglobinopathies. In one embodiment of the invention, hematopoietic progenitor or stem cells are transformed ex vivo and then restored to the patient. As used in the specification and claims hereof, the term "hematopoietic progenitor sand stem cells" encompasses hematopoietic cells and non-hematopoietic stem cells, e.g., embryonic stem cells, hematopoietic stem cell precursors, or any of the latter generated by nuclear transfer from a somatic cell. It is known in the art that efficient gene transfer into human embryonic stem cells can be achieved using lentiviral vectors.

Selection processes may be used to increase the percentage of transformed cells in the returned population. For example, a selection marker which makes transformed cells more drug resistant than un-transformed cells allows selection by treatment of the cells with the corresponding drug. When DHFR is used as a selection marker, it can be used for enrichment of transduced cells in vitro, or for in vivo selection to maintain the effectiveness of the vector.

The invention will now be further described with reference to the following non-limiting examples.

EXAMPLE 1

To produce vector TNS9, the human β-globin gene was subcloned from Mβ6L (Sadelain et al. Proc. Nat'l Acad. Sci. (USA)92: 6728-6732(1995)) into lentiviral vector pHR'LacZ (Zuffery et al., Nature 15: 871-875 (1997)) replacing the CMV-LacZ sequence. pHR'eGFP was constructed by replacing LacZ with the eGFP sequence (Clontech). Viral stocks were generated by triple transfection of the recombinant vectors pCMVΔR8.9 (Zuffrey et al.) and pMD.G in 293T cells as previously described in Dull, et al., J. Virol. 72: 8463-8471 (1998). The pseudotyped virions were concentrated by ultracentrifugation resuspended and titrated as described in Gallardo et al., Blood 90: 952-957 (1997). For comparison, RSN1 was used which has a similar structure, except that the LCR contains only the core portion of HS2, HS3 and HS4. Northern blot analysis showed full length RNA transcripts, indicating that the recombinant lentiviral genomoes are stable. Southern blot analysis on genomic DNA from transduced cells, digested once in each long terminal repeat (LTR) results in a single band corresponding to the expected size for the vector, indicating that the proviral structure is not rearranged.

5

## EXAMPLE 2

To investigate the tissue specificity, stage specificity and expression level of the vector-encoded human β-globin gene, we transduced RNS1 and TNS9 into MEL cells, lymphoid Jurkat cells and myeloid HL-60 cells. Cell-free viral supernatant was used to infect C88 MEL cells in the presence of polybrene (8 µg ml$^{-1}$). Transduced MEL cells were subcloned by limiting dilution, and screened by PCR for transduction[30] using primers that anneal in the human β-globin promoter sequence (βPS, 5'-GTCTAAGTGATGACAGC-CGTACCTG-3', Seq ID No.: 1) and in HS2 (C2A, 5'-TCAGCCTAGAGT GATGACTCC TATCTG-3', Seq ID No.: 2). Vector copy number and integration site analysis was determined by Southern blot analysis[9]. Transduced MEL cells were induced to maturation by 5-day culture in 5 mM N,N'-hexamethylene bisacetamide (HMBA, Sigma).

To induce β-globin transcription, transduced MEL cell pools were differentiated using hexamethylene bisacetamide HMBA). Human β-globin (β$^A$) and mouse β-globin transcripts were measured by quantitative primer extension. After normalization to vector copy number and to endogenous β-globin expression per allele, human β-globin levels were 14.2±4.7% for RNS1 and 71.3±2.3% for TNS9 in pooled MEL cells (FIG. 2a). MEL, Jurkat and HL-60 cells were transduced with RNS1, TNS9 or control GFP recombinant lentivirus. Human β-globin RNA expression in HMBA induced MEL cells (grey bars) was measured by quantitative primer extension and normalized to mouse β-globin RNA expression per locus. Expression was then normalized to the vector copy number determined by Southern blot. No human β-globin RNA expression was detected in non-induced MEL (black bars), Jurkat (white bars) or HL-60 cells (hatched bars), indicating that globin expression was erythroid- and differentiation-specific. No human β-globin expression was detected in non-induced MEL, Jurkat and HL-60 cells (FIG. 3), indicating that human β-globin expression was appropriately regulated in terms of tissue specificity and state of differentiation. We generated a panel of MEL cell clones that carried a single copy of either vector to distinguish whether the increased expression obtained in HMBA-treated Mel cells transduced with TNS9 rather than RNS1 was the result of an increase in β$^A$ expression per cell or of an increase in the fraction of cells expressing human β-globin. Transduced MEL cells were subcloned by limiting dilution immediately after transduction, avoiding any bias towards favourable chromosomal integration sites as produced by drug selection[5]. The proportion of clones expressing human β-globin varied significantly between the two vectors. One out of ten RNS1 positive clones yielded measurable human β-globin transcripts, in contrast to 12 out of 12 for TNS9 also expressed higher levels of human β-globin than did those bearing RNS1 (P<0.01, Fisher's exact test). Cells bearing TNS9 also expressed higher levels of human β-globin than did those bearing RNS1 (P<0.01, Wilcoxon rank sum test). These findings established that both the level and probability of expression at random integration sites was increased with the TNS9 vector.

## EXAMPLE 3

Quantification of Human β-globin mRNA

Total RNA was extracted from MEL, Jurkat and HL-60 cells, or mouse spleen and blood using TRIzol. Quantitative primer extension assays were done using the Primer Extension System-AMV Reverse Transcriptase kit (Promega) with [$^{32}$P] dATP end-labelled primers specific for retroviral-de-

6

rived human β-globin (5'-CAGTAACGGCAGACTTCTC-CTC-3', Seq ID No.: 3) and mouse β-globin (5'-TGATGTCT-GTTTCTGGGGTT GTG-3', Seq ID No.: 4), with predicted extension products of 90 bp and 53 bp, respectively. The probes yield products of identical length for β$^{mAJ}$, β$^{min}$, β$^A$ and β$^t$. Primers were annealed to 4 µg of RNA and reactions were run according to manufacturer's protocols. Radioactive bands were quantitated by phosphorimager analysis (Bio-Rad). RNA isolated from A85.68 mice[20] was used as positive control. After correction for primer labelling, the human to mouse RNA signal was 29±1% per gene copy in repeated experiments (n>8), in agreement with previous findings based on RT-PCR[20]. Values measured in bone marrow chimaeras that were obtained in separate runs were standardized to the value obtained in the A85.68 RNA sample. In FIGS. 2 and 3c, d, human β-globin expression is expressed per vector copy and normalized to the endogenous transcripts (accounting for two endogenous alleles). In FIG. 3b, human transcripts are reported as the fraction of total β-globin RNA (Huβ/Huβ+Muβ) to reflect absolute contribution of vector-encoded transcripts.

## EXAMPLE 4

To investigate the function of the vectors in vivo, we transduced and transplanted murine bone marrow cells without any selection in syngeneic, lethally irradiated recipient mice. Donor bone marrow was flushed from the femurs of 8- to 16-week-old male C57BL/6 or Hbb$^{th3/+mice}$ (Jackson Laboratories) that had been injected intravenously (i.v.) 6 days earlier with 5-flurouracil (5-FU, Pharmacia; 150 mg kg$^{-1}$ body weight). Bone marrow cells were resuspended in serum-free medium, and supplemented with IL-1α (10 ng ml$^{-1}$), IL-3 (100 U ml$^{-1}$), IL-6 (150 U ml$^{-1}$), Kit ligand (10 ng ml$^{-1}$) (Genzyme), β-mercaptoethanol (0.5 mM; Sigma), $_L$-glutamine (200 mM), penicillin (100 IU ml$^{-1}$) and streptomycin (100 µg ml$^{-1}$), and cultured for 18 h. Recipient mice (11- to 14-week-old C57BL/6 or Hbb$^{th3/+}$ mice) were irradiated with 10.5 Gy (split dose 2×5.25 Gy) on the day of transplantation. Bone marrow cells were pelleted and resuspended in serum-free medium containing concentrated lentiviral supernatant, and supplemented with polybrene (8 µg ml$^{-1}$), $_L$-glutamine (200 mM), penicillin (100 IU ml$^{-1}$) and streptomycin (100 µg ml$^{-1}$), and cultured for 6 h. Transduced bone marrow cells (1×10$^5$ or 5×10$^5$) were then i.v. injected into each of the irradiated female recipients to establish short-term and long-term bone marrow chimaeras, respectively.

In short-term studies, spleens were removed 12 d after transplantation to extract total RNA and genomic DNA. To monitor long-term chimaeras, two or three capillary tubes of blood were collected every 4-6 weeks, from which genomic DNA, total RNA and haemoglobin were extracted. To examine vector function reliably in long-term animals, erythroid cell populations were purified from spleen. Single-cell suspensions were incubated with rat anti-mouse TER-119 monoclonal antibody (PharMingen). Sheep anti-Rat IgG dynabeads (M-450, Dynal Inc.) Were added to the antibody-coated spleen cells and purified as recommended by the manufacturer. Vector copy number, integration pattern and chimaerism were determined by Southern blot analysis. The fraction of donor DNA relative to recipient was determined by stripping and reprobing the blot with a [$^{32}$P] dCTP-labelled probe specific for the Y chromosome and normalizing to an endogenous mouse band. Radioactive bands were quantitated by phosphorimager analysis. Sera from five randomly selected long-term bone marrow chimaeras (30 weeks after transplan-

7

8

tation) tested negative for HIV-1 gag by RT-PCR using the Amplicor HIV-1 monitor kit (Roche).

Vector copy number and human β-globin RNA transcripts were measured during a 24-week period in mice transplanted with RNS1 (n=8) or TNS9 (n=10) transduced bone marrow. a, Vector copy number was assessed by southern blot analysis of genomic DNA isolated from peripheral blood at weeks 6, 10, 16 and 24. The average vector copy number in peripheral blood cells, measured periodically for 24 weeks (FIG. 4), showed highly efficient gene transfer with both vectors (1.8±0.6 and 0.8±0.6 average vector copies per cell for β-globin transcript levels in the 10-20% range during the same time period. To assess transcriptional activity per vector copy, steady-state RNA transcripts and vector copy number were quantified in pooled CFU-$S_{12}$ and in erythroid TER-119+ spleen cells. Twelve days after transplantation, human β-globin expression per endogenous allele, (FIG. 5a). Twenty weeks later these values were 0.5±0.1% (significantly lower than on day 12, P=0.02) and 15.8±0.9% respectively (FIG. 5b). These findings established that the larger LCR fragments increased globin expression in vivo and, furthermore, suggested that TNS9 is more resistant to transcriptional silencing than is RNS1.

The levels of TNS9-encoded human β-globin could be produced. Haemoglobin tetramers incorporating vector-encoded human $β^A$ and endogenous murine α-globin (designated Hbb$^{hu}$) were quantitated in peripheral blood red cell lysates after cellulose acetate gel fractionation. Hbb$^{hu}$ levels accounting for up to 13% of total haemoglobin were found 24 weeks after transplantation (FIG. 3e, Table 1 in Supplementary Information). In the same assays, transgenic mice bearing one copy of a 230-kb yeast artificial chromosome (YAC)[20] encompassing the entire human β-globin like gene cluster[20] showed 14% of their total haemoglobin incorporating human $β^A$. No haemoglobin tetramers containing human $β^A$ were measurable in any of the mice bearing RNS1 (table 1 in Supplementary Information). The proportion of mature peripheral blood red cells expressing human $β^A$ was elevate in most TNS9 bone marrow chimaeras, as shown by dual staining of human $β^A$ and TER-119. In contrast, chimaeras engrafted with RNS1-transduced bone marrow showed highly variable fractions of weakly staining $β^A$-positive erythrocytes. Normalized to the fraction of circulating $β^A$-positive mature red cells, the levels of haemoglobin containing lentivirus-encoded $β^A$ were on average 64% of those obtained in the YAC transgenic mice.

EXAMPLE 5

To ascertain that true HSCs were transduced, we carried out secondary transplants using marrow from primary recipients collected 24 weeks after transplantation. The TNS9 and RNS1 vectors were readily detected in all secondary recipients 13 weeks after transplantation. Human β-globin expression was maintained in all recipients of TNS9-transduced marrow. The successful transduction of HSCs was confirmed by integration site analyses. Southern blot analysis was performed on genomic DNA isolated from bone marrow, spleen and thymus of secondary bone marrow transplant recipients collected 13 weeks after transplant (one representative RNS1, and two representative TNS9 secondary transplant recipients are shown). Two endogenous bands are found in the genomic DNA of C57BL/6 (B6) mice.

EXAMPLE 6

In view of the high levels of expression, we tested the extent to which the TNS9 vector could correct the phenotype

of thalassaemic cells using $β^0$-thalassaemic heterozygote mice that lack a copy of their b1 and b2 β-globin genes (Hbb$^{th3/+}$)[21]. These heterozygotes have a clinical phenotype similar to human thalassaemia intermedia and exhibit chronic anaemia (haematocrit 28-30%, haemoglobin 8-9 g dl$^{-1}$) and anomalies in red cell size (anisocytosis) and shape (poikilocytosis). Fifteen weeks after transplantation with unselected TNS9-transduced Hbb$^{th3/+}$ bone marrow, the haematocrit level, red blood cell count, reticulocyte count and haemoglobin level were markedly improved in five out of five recipient mice (FIG. 6). Anisocytosis and poikilocytosis were markedly reduced in the peripheral blood smears of chimaeras bearing the TNS9 vector. Control mice transplanted with Hbb$^{th3/+}$ bone marrow cells transduced with a vector encoding enhanced green fluorescent protein (eGFP) all remained severely anaemic (n=5, FIG. 6) and maintained their abnormal red cell morphology. RNS1, which carries a weaker enhancer, silenced over time whereas TNS9 retained undiminished transcriptional activity over the same time period and in secondary transplant recipients.

The combined effect of the high efficiency of gene transfer and the absence of vector rearrangements afforded by the recombinant lentivirus carrying the β-globin gene and LCR configuration adopted in TNS9 yielded levels of human $β^A$ expression in the therapeutic range. The higher expression obtained with TNS9 compared with RNS1 was associated with a higher fraction of permissive integration sites in MEL cells and a higher fraction of human $β^A$-containing red blood cells in bone marrow chimaeras. RNS1, which carries a weaker enhancer, silenced over time whereas TNS9 retained undiminished transcriptional activity over the same time period and in secondary transplant recipients.

Higher levels of murine $α_2$: human $β^A{}_2$ tetramers were obtained in peripheral blood samples from recipients of TNS9-transduced Hbb$^{th3/+}$ bone marrow (21±3% of total haemoglobin, n=5, than with Hbb$^{+/+}$ bone marrow (6±4%, n+10). These two groups showed comparable peripheral blood vector copy numbers and levels of human β-globin RNA (0.8±0.2 compared with 0.8±0.6, and 16.8±6% compared with 10.8±7%, respectively). This observation is consistent with a competitive advantage of murine β-globin over human β-globin in associating with murine α-globin[22]. In thalassaemic patients, added human β-chain synthesis would improve the α:β chain imbalance and thus increase red cell survival and ameliorate the ineffective erythropiesis in these patients. In patients with sickle cell disease, transduced $β^A$ chains are expected to have an advantage over the $β^S$ chains produced by both endogenous genes in competing for the available α-chains[23]. Given that patients with S/β-thalassaemia whose HbA represents 10-30% of their total haemoglobin are very mildly affected[1/24], the clinical benefit of such an intervention would be highly significant.

EXAMPLE 7

To investigate long-term expression of the transduced human β-globin genes and its therapeutic efficacy, we generated bone marrow chimeras engrafted with TNS9-transduced Hbb$^{th3/+}$ bone marrow cells (n=5) and studied them over a 40-week period.

Donor bone marrow was flushed from the tumors of 8- to 16-week old male c57/BL6 or Hbb$^{th3/+}$ mice[23] obtain from Jackson Laboratories (Bar Harbor, Me.) that had been injected intravenously (IV) 6 days earlier with 5-flurouracil (5-FU) 150 mg/kg body weight obtained from Pharmacia (Piscataway, N.J.). Bone marrow cells were resuspended in X-VIVO-15 serum-free medium and supplemented with 10 ng/mL interleukin-1 α (IL-1α) 100 U/mL IL-3, 150 U/mL

IL-6, 10 ng/mL Kit ligand obtained from Genzyme (Cambridge, Mass.), 0.5 mM β-mercaptoethanol obtained from Sigma (St. Louis, Mo.), 200-mM $_L$-glutamine, 100 IU/mL penicillin, and 100 μg/mL streptomycin. Bone marrow cells were then pelleted and resuspended in serum-free medium containing concentrated lentiviral supernatant and supplemented with 8 mg/mL polybrene (Sigma), 200 mM $_L$-glutamine, 100 U/mL penicillin, 100 μg/mL streptomycin and cytokines as above, and cultured for 8 hours. Transduced bone marrow cells ($5×10^5$) were then injected IV into each of the irradiated female recipients to establish bone marrow chimeras. Recipients mice (11- to 14-week-old C57/BL6 or Hbb$^{th3/+}$ mice) were irradiated with 10.5 Gy (Split dose 2×5.25 Gy) on the day of transplantation.

Age-matched chimeras engrafted with eGFP-transduced Hbb$^{th3/+}$ (n=5) and Hbb$^{+/+}$ (n=5) bone marrow cells served as controls. Vector copy number was monitored in peripheral blood by quantitive Southern blot analysis, and found to remain stable, between 0.5 and 1.0 copy/cell on average (data not shown). Protein expression was assessed by quantitive hemoglobin analysis, to measure the proportion of hemoglobin tetramers that incorporate human $β^A$ (Hbb$^{hu}$, mu α$_2$: huβ$^A_2$) or murine β-globin (Hbb$^{mu}$, muα$_2$:muβ$^A_2$), and immunofluorescence, to determine the fraction of mature RBCs that contain human $β^A$ protein. Transgenic mice bearing one copy of a 230-kb yeast artificial chromosome encompassing the entire human β-globin-like gene cluster[28] served as reference, showing 14% of their total hemoglobin incorporating human $β^A$ and 100% RBCs[19,28] Hbb$^{hu}$ accounted for 19% to 22% of the total hemoglobim in TNS9 chimeras. These levels remained stable up to 40 weeks after transplantation. Over this same time period, the proportion of mature peripheral RBCs expressing human $β^A$ also remained elevated and stable (about 70% to 80%), as shown by dual staining of human $β^A$ and TER-119.

### EXAMPLE 8

Long-Term Amelioration of Anemia

The stability of TNS9-encoded $β^A$ expression detected in peripheral blood suggested that long-trem hematologic and systemic therapeutic benefits could be obtained. To investigate whether Hbb$^{hu}$ production would suffice to treat the anemia, we closely monitored hemoglobin parameters over 40 weeks. The marked increase in hemoglobin concentration, RBC counts, and hematocrit was sustained throughout this time period. Control mice that received transplants of eGFP-transduced Hbb$^{th3/+}$ bone marrow cells remained severely anemic, indicating that the transplantation procedure itself did not alter the anemic state. The reticulocyte counts decreased to 5% to 8% in TNS9 treated-chimeras, compared to 19% to 21% in control eGFP-treated Hbb$^{th3/+}$ chimeras and age-matched Hbb$^{th3/+}$ mice, suggesting an increase in RBC life span and a decrease in erythropoietic activity.

### EXAMPLE 9

To determine the impact of sustained human β-globin gene expression on hematopoiesis, we studied the degree of splenomegaly (enlargement of the spleen) and EMH in 1-year-old chimeras and age-matched control mice. Spleen weights measured in Tns9-treated Hbb$^{th3/+}$ chimeras were indistinguishable from recipients of eGFP-transduced normal bone marrow, as were the total number of cells per spleen. In contrast, mice engrafted with eGFP-transduced Hbb$^{th3/+}$ bone marrow cells showed spleen weights and total cell numbers that were about 3-fold greater. The correction of spleen

weight in TNS9 bone marrow chimeras corresponded to a concomitant normalization in total hematopoietic progenitor cell content. Spleen CFU-Es, BFUEs, and CFUs-GM were reduced to levels measured in recipients of eGFP-transduced Hbb$^{th+/+}$ bone marrow, whereas they remained elevated in control chimeras engrafted with eGFP-trasduced Hbb$^{th3/+}$ bone marrow cells and in age-matched Hbb$^{th3/+}$ mice, as previously observed in another murine model of β-thalassemis.[29]

The regression of EMH was corroborated by morphologic examination of spleen and liver in long-term chimeras and age-match controls. Histopathology of spleens of mice that received transplants of eGFP-transduced Hbb$^{th3/+}$ marrow was virtually identical to that of spleen from control Hbb$^{th3/+}$ mice. Specifically, the red pulp was significantly expanded, accounting for 80% to 90% of the cross-sectional area, and densely occupied by nucleated erythroid precursors. The white pulp, based on cross-sectional area, was relatively decreased and the marginal zones were obscured by the large number of nucleated RBCs, reflecting major expansion of the red pulp and erythroid precursors. In TNS9-treated chimeras, the amount of red pulp was considerably decreased, accounting for only about 50% to 60% of the cross-sectional area. In addition, the number of nucleated erythroid precursors in the red pulp was decreased. Other immature hematopoietic cells were present in the red pulp, but much less frequently than in the spleens of control Hbb$^{th3/+}$ thalassemic mice. The livers from TNS9-treated chimeras were similar to those of the normal control mice in that no EMH was detected. In contrast, livers from mice engrafted with eGFP-trasduced Hbb$^{th3/+}$ bone marrow cells showed several small foci of intrasinusoidal EMH.

### EXAMPLE 10

Toxic iron accumulation in the organs of thalassemic patients is a consequence of RBC destruction and increased gastrointestinal iron uptake. To determine whether sustained expression from the TNS9 vector reduced iron overload, we studied tissue sections of liver and heart, stained using Gomori iron stain. No iron deposition was seen in the livers of normal Hbb$^{+/+}$ control mice, whereas Hbb$^{th3/+}$ mice showed variable amounts of iron, including some large aggregates. TNS9-trasduced treated chimeras demonstrated low to undetectable levels of iron in the livers, whereas iron was readily detected in the livers of all mice that received transplants of eGFP-transduced Hbb$^{th3/+}$ bone marrow cells. No iron accumulation was found in the heart of treated or control mice, as previously observed in another murine model of β-thalassemia,[30] in contrast to what is found in the human disease.[1-3]

### EXAMPLE 11

To assess to efficacy of in vivo selection for cells transduced with globin and DHFR-encoding vectors in accordance with the invention, using antifolates the following alternative protocols are used. In protocol 1, the recipient mice are treated daily for 5 days with MTX (25 mg/Kg) and NBMPR-P (20 mg/Kg), starting 6 weeks after administration of transduced bone marrow cells. In protocol 2, the recipient mice are treated daily for 5 days with TMTX (40 mg/Kg) and NBMPR-P (20 mg/Kg), starting 6 weeks after administration of transduced bone marrow cells. In protocol 3, the recipient mice, conditioned with busulphan rather than with gamma-irradiation, are treated daily for 5 days with TMTX (40 mg/Kg) and NBMPR-P (20 mg/Kg), starting 4 weeks after administration of transduced bone marrow cells. (TMTX

US 7,541,179 B2

11

(Neutrexin; U.S. Bioscience); >MTX (Methotrexate LPF Sodium; Immunex); NBMPR-P (Nitrobenzylthioinosine 5'-monophpsphate disodium salt; Alberta nucleoside therapeutics). Protocol 3 is in principle the most attractive protocol as the recipients are not irradiated and furthermore not treated with a "myeloablative conditioning regimen". They are treated with a relatively milder conditioning regimen consisting of a "non-myeloablative" dose of busulphan. It is hoped that, in combination with "in vivo selection" mediated by DHFR/TMTX, the recipients could be satisfactorily engrafted without receiving a harsh pre-transplant treatment. This would be the way to go for treating subjects with severe hemoglobinopathies.

12

3. The vector of claim 2, further comprising a mouse PGK promoter to control the expression of the dihydrofolate reductase.

4. The vector of claim 3, wherein the dihydrofolate reductase is a human dihydrofolate reductase.

5. The vector of claim 4, wherein the human dihydrofolate reductase is a mutant dihydrofolate reductase having increased resistance to antifolates as compared to wild-type human dihydrofolate reductase and differing in amino acid sequence from wild-type human dihydrofolate reductase.

6. The vector of claim 5, wherein the mutant dihydrofolate reductase comprises a mutation at an amino acid correspond-

```
                         SEQUENCE LISTING


<160> NUMBER OF SEQ ID NOS: 4

<210> SEQ ID NO 1
<211> LENGTH: 25
<212> TYPE: DNA
<213> ORGANISM: human

<400> SEQUENCE: 1

gtctaagtga tgacagccgt acctg                                      25


<210> SEQ ID NO 2
<211> LENGTH: 27
<212> TYPE: DNA
<213> ORGANISM: human

<400> SEQUENCE: 2

tcagcctaga gtgatgactc ctatctg                                    27


<210> SEQ ID NO 3
<211> LENGTH: 22
<212> TYPE: DNA
<213> ORGANISM: human

<400> SEQUENCE: 3

cagtaacggc agacttctcc tc                                         22


<210> SEQ ID NO 4
<211> LENGTH: 23
<212> TYPE: DNA
<213> ORGANISM: mouse

<400> SEQUENCE: 4

tgatgtgtgt ttctggggtt gtg                                        23
```

What is claimed is:

1. A recombinant vector comprising a nucleic acid encoding a functional globin operably linked to a 3.2-kb nucleotide fragment which consists essentially of three contiguous nucleotide fragments obtainable from a human β-globin locus control region (LCR), the three fragments being a BstXI and SnaBI HS2-spanning nucleotide fragment of said LCR, a BamHI and HindIII HS3-spanning nucleotide fragment of said LCR and a BamHI and BanII HS4-spanning nucleotide fragment of said LCR, said vector providing expression of the globin in a mammal in vivo.

2. The vector of claim 1, further comprising a nucleic acid encoding a dihydrofolate reductase.

ing to amino acid 22 of the wild-type sequence and a mutation at an amino acid corresponding to amino acid 31 of the wild type sequence.

7. The vector of claim 2, wherein the dihydrofolate reductase is a human dihydrofolate reductase.

8. The vector of claim 7, wherein the human dihydrofolate reductase is a mutant dihydrofolate reductase having increased resistance to antifolates as compared to wild-type human dihydrofolate reductase and differing in amino acid sequence from wild-type human dihydrofolate reductase.

9. The vector of claim 8, wherein the mutant dihydrofolate reductase comprises a mutation at an amino acid correspond-

US 7,541,179 B2

13

14

ing to amino acid 22 of the wild-type sequence and a mutation at an amino acid corresponding to amino acid 31 of the wild type sequence.

10. The vector of claim 1, wherein the functional globin is human β-globin.

11. The vector of claim 10, further comprising a nucleic acid encoding a dihydrofolate reductase.

12. The vector of claim 11, further comprising a mouse PGK promoter to control the expression of the dihydrofolate reductase.

13. The vector of claim 12, wherein the dihydrofolate reductase is a human dihydrofolate reductase.

14. The vector of claim 13, wherein the human dihydro-folate reductase is a mutant dihydrofolate reductase having increased resistance to antifolates as compared to wild-type human dihydrofolate reductase and differing in amino acid sequence from wild-type human dihydrofolate reductase.

15. The vector of claim 14, wherein the mutant dihydro-folate reductase comprises a mutation at an amino acid cor-responding to amino acid 22 of the wild-type sequence and a mutation at an amino acid corresponding to amino acid 31 of the wild type sequence.

16. The vector of claim 11, wherein the dihydrofolate reductase is a human dihydrofolate reductase.

17. The vector of claim 16, wherein the human dihydro-folate reductase is a mutant dihydrofolate reductase having increased resistance to antifolates as compared to wild-type human dihydrofolate reductase and differing in amino acid sequence from wild-type human dihydrofolate reductase.

18. The vector of claim 17, wherein the mutant dihydro-folate reductase comprises a mutation at an amino acid cor-responding to amino acid 22 of the wild-type sequence and a mutation at an amino acid corresponding to amino acid 31 of the wild type sequence.

19. The vector of claim 1, wherein the functional globin is a β-globin.

20. The vector of claim 1, wherein the functional globin is a γ-globin.

21. The vector of claim 1, wherein the functional globin is an α-globin.

22. The vector of claim 1, wherein the vector is a lentiviral vector.

23. A recombinant vector comprising a nucleic acid encod-ing a functional globin operably linked to a 3.2-kb nucleotide fragment which consists essentially of three nucleotide frag-ments obtainable from a human β-globin LCR, the three fragments being a BstXI and SnaBI, HS2-spanning nucle-otide fragment of said LCR, a BamHI and HindIII, HS3-spanning nucleotide fragment of said LCR, and a BamHI and BanII, HS4-spanning nucleotide fragment of said LCR, wherein the HS3-spanning nucleotide fragment and the HS4-spanning nucleotide fragment are adjacent to each other and the vector further comprises 2 GATA-1 binding sites at the junction between the HS3-spanning and HS4-spanning nucleotide fragments, said vector providing expression of the globin in a mammal in vivo.

24. The vector of claim 23, wherein the vector is pTNS9.

*   *   *   *   *

**EXHIBIT 2**



LEXSEE 580 F. SUPP. 2D 138

**WYETH, et al., Plaintiffs, v. JON W. DUDAS, Under Secretary of Commerce for Intellectual Property and Director of U.S. Patent and Trademark Office, Defendant.**

**Civil Action No. 07-1492 (JR)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*580 F. Supp. 2d 138; 2008 U.S. Dist. LEXIS 76063; 88 U.S.P.Q.2D (BNA) 1538*

**September 30, 2008, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In filed an action, claiming that the United States Patent and Trademark Office (PTO) had misconstrued or misapplied *35 U.S.C.S. § 154(b)(2)(A)*, and that the PTO was denying them a portion of the term Congress had provided for the protection of their intellectual property rights.

**OVERVIEW:** The PTO's view was that any administrative delay under *§ 154(b)(1)(A)* overlapped any three-year maximum pendency delay under *§ 154(b)(1)(B)*: the applicant got credit for "A delay" or for "B delay," whichever was larger, but never A + B. Chevron deference did not apply to the interpretation at issue here. Further, Chevron would not have saved the PTO's interpretation because it could not be reconciled with the plain text of the statute. The operative question under *§ 154(b)(2)(A)* was whether periods of delay attributable to grounds specified in *§ 154(b)(1)* overlapped. The problem with the PTO's construction was that it considered the application delayed under *§ 154(b)(1)(B)* during the period before it had been delayed. That construction could not be squared with the language of *§ 154(b)(1)(B)*, which applied if the issue of an original patent was delayed due to the failure of the PTO to issue a patent within three years. "B delay" began when the PTO had failed to issue a patent within three years, not before.

**OUTCOME:** The court construed the statute at issue.

**LexisNexis(R) Headnotes**

*Patent Law > Infringement Actions > Exclusive Rights > General Overview*
[HN1] *35 U.S.C.S. § 154(a)(2)* establishes a term of 20 years from the day on which a successful patent application is first filed. Because the clock begins to run on this filing date, and not on the day the patent is actually granted, some of the effective term of a patent is consumed by the time it takes to prosecute the application. To mitigate the damage that bureaucracy can do to inventors, the statute grants extensions of patent terms for certain specified kinds of United States Patent and Trademark Office delay, *35 U.S.C.S. § 154(b)(1)(A)*, and, regardless of the reason, whenever the patent prosecution takes more than three years. *35 U.S.C.S. § 154(b)(1)(B)*. Recognizing that the protection provided by these separate guarantees might overlap, Congress has forbidden double-counting.

*Patent Law > Infringement Actions > Exclusive Rights > General Overview*
[HN2] See *35 U.S.C.S. § 154(b)(2)(A)*.

*Patent Law > Infringement Actions > Exclusive Rights*

580 F. Supp. 2d 138, *; 2008 U.S. Dist. LEXIS 76063, **;
88 U.S.P.Q.2D (BNA) 1538

> *General Overview*

[HN3] *35 U.S.C.S. § 154(b)* provides three guarantees of patent term. The first is found in *§ 154(b)(1)(A)*, the guarantee of prompt United States Patent and Trademark Office (PTO) response. It provides a one-day extension of patent term for every day that issuance of a patent is delayed by a failure of the PTO to comply with various enumerated statutory deadlines: 14 months for a first office action; 4 months to respond to a reply; 4 months to issue a patent after the fee is paid; and the like. *§ 154(b)(1)(A)(i)-(iv)*. Periods of delay that fit under this provision are called "A delays" or "A periods." The second provision is the guarantee of no more than three-year application pendency. Under this provision, a one-day term extension is granted for every day greater than three years after the filing date that it takes for the patent to issue, regardless of whether the delay is the fault of the PTO. *§ 154(b)(1)(B)*. The period that begins after the three-year window has closed is referred to as the "B delay" or the "B period."

*Patent Law > Infringement Actions > Exclusive Rights > General Overview*

[HN4] See *35 U.S.C.S. § 154(b)(2)(A)*.

*Administrative Law > Judicial Review > Standards of Review > Statutory Interpretation*
*Patent Law > U.S. Patent & Trademark Office Proceedings > General Overview*

[HN5] The United States Patent and Trademark Office is not afforded Chevron deference because it does not have the authority to issue substantive rules, only procedural regulations regarding the conduct of proceedings before the agency.

*Patent Law > Infringement Actions > Exclusive Rights > General Overview*
*Patent Law > U.S. Patent & Trademark Office Proceedings > General Overview*

[HN6] The authority of the United States Patent and Trademark Office is limited to prescribing regulations establishing procedures for the application for and determination of patent term adjustments under this subsection. *35 U.S.C.S. § 154(b)(3)(A)*

*Patent Law > Infringement Actions > Exclusive Rights > General Overview*

*Patent Law > U.S. Patent & Trademark Office Proceedings > General Overview*

[HN7] In *35 U.S.C.S. § 154(b)(2)(C)(iii)* the United States Patent and Trademark Office is given the power to prescribe regulations establishing the circumstances that constitute a failure of an applicant to engage in reasonable efforts to conclude processing or examination of an application--that is, the power to elaborate on the meaning of a particular statutory term. No such power is granted under *§ 154(b)(3)(A)*.

*Administrative Law > Judicial Review > Standards of Review > Statutory Interpretation*

[HN8] If the statutory text is not ambiguous enough to permit the construction that the agency urges, that construction fails at Chevron's "step one," without regard to whether it is a reasonable attempt to reach a result that Congress might have intended.

*Patent Law > Infringement Actions > Exclusive Rights > General Overview*

[HN9] In the context of *35 U.S.C.S. § 154(b)(2)(A)*, the only way that periods of time can "overlap" is if they occur on the same day. If an "A delay" occurs on one calendar day and a "B delay" occurs on another, they do not overlap, and *§ 154(b)(2)(A)* does not limit the extension to one day.

**COUNSEL:** [**1] WYETH, Plaintiff: David O. Bickart, LEAD ATTORNEY, Patricia A. Carson, PRO HAC VICE, KAYE SCHOLER LLP, Washington, DC.

For ELAN PHARMA INTERNATIONAL LIMITED, Plaintiff: David O. Bickart, LEAD ATTORNEY, KAYE SCHOLER LLP, Washington, DC.

For JON W. DUDAS, Honorable, Under Secretary of Commerce, Defendant: Fred Elmore Haynes, LEAD ATTORNEY, U.S. ATTORNEY'S OFFICE, Washington, DC.

**JUDGES:** JAMES ROBERTSON, United States District Judge.

**OPINION BY:** JAMES ROBERTSON

**OPINION**

Page 3

580 F. Supp. 2d 138, *139; 2008 U.S. Dist. LEXIS 76063, **1;
88 U.S.P.Q.2D (BNA) 1538

[*139] *MEMORANDUM OPINION*

Plaintiffs here take issue with the interpretation that the United States Patent and Trademark Office (PTO) has imposed upon 35 U.S.C. § 154, the statute that prescribes patent terms. [HN1] *Section 154(a)(2)* establishes a term of 20 years from the day on which a successful patent application is first filed. Because the clock begins to run on this filing date, and not on the day the patent is actually granted, some of the effective term of a patent is consumed by the time it takes to prosecute the application. To mitigate the damage that bureaucracy can do to inventors, the statute grants extensions of patent terms for certain specified kinds of PTO delay, *35 U.S.C. § 154(b)(1)(A)*, and, regardless of the reason, whenever the patent prosecution [**2] takes more than three years. *35 U.S.C. § 154(b)(1)(B)*. Recognizing that the protection provided by these separate guarantees might overlap, Congress has forbidden double-counting: [HN2] "To the extent that periods of delay attributable to grounds specified in paragraph (1) overlap, the period of any adjustment granted under this subsection shall not exceed the actual number of days the issuance of the patent was delayed." *35 U.S.C. § 154(b)(2)(A)*. Plaintiffs claim that the PTO has misconstrued or misapplied this provision, and that the PTO is denying them a portion of the term Congress has provided for the protection of their intellectual property rights.

**Statutory Scheme**

Until 1994, patent terms were 17 years from the date of issuance. *See 35 U.S.C. § 154 (1992)* ("Every patent shall contain . . . a grant . . . for the term of seventeen years . . . of the right to exclude others from making, using, or selling the invention throughout the United States. . . ."). In 1994, in order to comply with treaty obligations under the General Agreement on Tarriffs and Trade (GATT), the statute was amended to provide a 20-year term from the date on which the application is first filed. *See* Pub. L. No. 103-465, § 532, 108 Stat. 4809, 4984 (1994). [**3] In 1999, concerned that extended prosecution delays could deny inventors substantial portions of their effective patent terms under the new regime, Congress enacted the American Inventors Protection Act, a portion of which -- referred to as the Patent Term Guarantee Act of 1999 -- provided for the adjustments that are at issue in this case. Pub. L. No. 106-113, §§ 4401-4402, 113 Stat. 1501, 1501A-557 (1999).

As currently codified, [HN3] *35 U.S.C. § 154(b)* provides three guarantees of patent term, two of which are at issue here. The first is found in *subsection (b)(1)(A)*, the "[g]uarantee of prompt Patent and Trademark Office response." It provides a one-day extension of patent term for every day that issuance of a patent is delayed by a failure of the PTO to comply with various enumerated statutory deadlines: fourteen months for a first office action; four months to respond to a reply; four months to issue a patent after the fee is paid; and the like. *See 35 U.S.C. § 154(b)(1)(A)(i)-(iv)*. Periods of delay that fit under this provision are called "A delays" or "A periods." The second provision is the "[g]uarantee of no more than 3-year application pendency." Under this provision, a one-day [**4] term extension is granted for every day greater than three years after the filing date that it takes for the patent to issue, regardless of whether the delay is the fault of the PTO. [1] *See 35 U.S.C. § 154(b)(1)(B)*. [*140] The period that begins after the three-year window has closed is referred to as the "B delay" or the "B period". ("C delays," delays resulting from interferences, secrecy orders, and appeals, are similarly treated but were not involved in the patent applications underlying this suit.)

> 1   Certain reasons for exceeding the three-year pendency period are excluded, *see 35 U.S.C. § 154(b)(1)(B)(i)-(iii)*, as are periods attributable to the applicant's own delay. *See 35 U.S.C. § 154(b)(2)(C)*.

The extensions granted for A, B, and C delays are subject to the following limitation:

> (A) In general.--[HN4] To the extent that periods of delay attributable to grounds specified in paragraph (1) overlap, the period of any adjustment granted under this subsection shall not exceed the actual number of days the issuance of the patent was delayed.

*35 U.S.C. § 154(b)(2)(A)*. This provision is manifestly intended to prevent double-counting of periods of delay, but understanding that intent does not answer [**5] the question of what is double-counting and what is not. Proper interpretation of this proscription against windfall extensions requires an assessment of what it means for "periods of delay" to "overlap."

The PTO, pursuant to its power under *35 U.S.C. § 154(b)(3)(A)* to "prescribe regulations establishing procedures for the application for and determination of patent term adjustments," has issued final rules and an "explanation" of the rules, setting forth its authoritative construction of the double-counting provision. The rules that the PTO has promulgated essentially parrot the statutory text, *see 37 C.F.R. § 1.703(f)*, and so the real interpretive act is found in something the PTO calls its Explanation of *37 CFR 1.703(f)* and of the United States Patent and Trademark Office Interpretation of *35 U.S.C. § 154(b)(2)(A)*, which was published on June 21, 2004, at *69 Fed. Reg. 34238*. Here, the PTO "explained" that:

> the Office has consistently taken the position that if an application is entitled to an adjustment under the three-year pendency provision of *35 U.S.C. § 154(b)(1)(B)*, *the entire period during which the application was pending before the Office* (except for periods excluded under [**6] *35 U.S.C. § 154 (b)(1)(B)(i)-(iii)*), and not just the period beginning three years after the actual filing date of the application, *is the relevant period under 35 U.S.C. § 154 (b)(1)(B) in determining whether periods of delay "overlap" under 35 U.S.C. 154(b)(2)(A).*

*69 Fed. Reg. 34238 (2004)* (emphasis added). In short, the PTO's view is that any administrative delay under *§ 154(b)(1)(A)* overlaps any 3-year maximum pendency delay under *§ 154(b)(1)(B)*: the applicant gets credit for "A delay" or for "B delay," whichever is larger, but never A + B.

In the plaintiffs' submission, this interpretation does not square with the language of the statute. They argue that the "A period" and "B period" overlap only if they occur on the same calendar day or days. Consider this example, proffered by plaintiff: A patent application is filed on 1/1/02. The patent issues on 1/1/08, six years later. In that six-year period are two "A periods," each one year long: (1) the 14-month deadline for first office action is 3/1/03, but the first office action does not occur until 3/1/04, one year late; (2) the 4-month deadline for patent issuance after payment of the issuance fee is 1/1/07, but the patent does not [**7] issue until 1/1/08, another year of delay attributable to the PTO. According to plaintiff, the "B period" begins running on 1/1/05,

three years after the patent application was filed, and ends three years later, with the issuance of the patent on 1/1/08. In this [*141] example, then, the first "A period" does not overlap the "B period," because it occurs in 2003-04, not in 2005-07. The second "A period," which covers 365 of the same days covered by the "B period," does overlap. Thus, in plaintiff's submission, this patent holder is entitled to four years of adjustment (one year of "A period" delay + three years of "B period" delay). But in the PTO's view, since "the entire period during which the application was pending before the office" is considered to be "B period" for purposes of identifying "overlap," the patent holder gets only three years of adjustment.

### *Chevron* Deference

We must first decide whether the PTO's interpretation is entitled to deference under *Chevron v. NRDC, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)*. No, the plaintiffs argue, because, under the Supreme Court's holdings in *Gonzales v. Oregon, 546 U.S. 243, 126 S. Ct. 904, 163 L. Ed. 2d 748 (2006)*, and *United States v. Mead Corp., 533 U.S. 218, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001)*, Congress has not "delegated [**8] authority to the agency generally to make rules carrying the force of law," and in any case the interpretation at issue here was not promulgated pursuant to any such authority. *See Gonzales, 546 U.S. at 255-56, citing Mead, 533 U.S. at 226-27*. Since at least 1996, the Federal Circuit has held that [HN5] the PTO is not afforded *Chevron* deference because it does not have the authority to issue substantive rules, only procedural regulations regarding the conduct of proceedings before the agency. *See Merck & Co. v. Kessler, 80 F.3d 1543, 1549-50 (Fed. Cir. 1996)*.

Here, as in *Merck,* [HN6] the authority of the PTO is limited to prescribing "regulations establishing *procedures* for the application for and determination of patent term adjustments under this subsection." *35 U.S.C. § 154(b)(3)(A)* (emphasis added). Indeed, a comparison of this rulemaking authority with the authority conferred for a different purpose in the immediately preceding section of the statute makes it clear that the PTO's authority to interpret the overlap provision is quite limited. [HN7] In *35 U.S.C. § 154(b)(2)(C)(iii)* the PTO is given the power to "prescribe regulations establishing the *circumstances that constitute* a failure of an applicant [**9] to engage in reasonable efforts to conclude

processing or examination of an application" (emphasis added) -- that is, the power to elaborate on the meaning of a particular statutory term. No such power is granted under *§ 154(b)(3)(A)*. *Chevron* deference does not apply to the interpretation at issue here.

**Statutory Construction**

*Chevron* would not save the PTO's interpretation, however, because it cannot be reconciled with the plain text of the statute. [HN8] If the statutory text is not ambiguous enough to permit the construction that the agency urges, that construction fails at *Chevron's* "step one," without regard to whether it is a reasonable attempt to reach a result that Congress might have intended. *See, e.g., MCI v. AT&T, 512 U.S. 218, 229, 114 S. Ct. 2223, 129 L. Ed. 2d 182 (1994)* ("[A]n agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear.").

The operative question under *35 U.S.C. § 154(b)(2)(A)* is whether "periods of delay attributable to grounds specified in paragraph (1) overlap." [HN9] The only way that periods of time can "overlap" is if they occur on the same day. If an "A delay" occurs on one calendar day and a "B delay" occurs on another, they do not [**10] overlap, and *§ 154(b)(2)(A)* does not limit the extension to one day. Recognizing this, [*142] the PTO defends its interpretation as essentially running the "period of delay" under *subsection (B)* from the filing date of the patent application, such that a period of "B delay" *always overlaps* with any periods of "A delay" for the purposes of applying *§ 154(b)(2)(A)*.

The problem with the PTO's construction is that it considers the application *delayed* under *§ 154(b)(1)(B)* during the period *before it has been delayed*. That construction cannot be squared with the language of *§ 154(b)(1)(B)*, which applies "if the issue of an original patent is *delayed* due to the failure of the United States Patent and Trademark Office to issue a patent within 3 years." (Emphasis added.) "B delay" begins when the PTO has failed to issue a patent within three years, not

before.

The PTO's interpretation appears to be driven by Congress's admonition that any term extension "not exceed the actual number of days the issuance of the patent was delayed," and by the PTO's view that "A delays" during the first three years of an applications' pendency inevitably lead to "B delays" in later years. Thus, as the PTO sees it, if [**11] plaintiffs' construction is adopted, one cause of delay will be counted twice: once because the PTO has failed to meet and administrative deadline, and again because that failure has pushed back the entire processing of the application into the "B period." Indeed, in the example set forth above, plaintiffs' calendar-day construction does result in a total effective patent term of 18 years under the (B) guarantee, so that -- again from the PTO's viewpoint -- the applicant is not "compensated" for the PTO's administrative delay, he is benefitted by it.

But if *subsection (B)* had been intended to guarantee a 17-year patent term and *no more,* it could easily have been written that way. It is true that the legislative context -- as distinct from the legislative history -- suggests that Congress may have intended to use *subsection (B)* to guarantee the 17-year term provided before GATT. But it chose to write a "[g]uarantee of no more than 3-year application pendency," *35 U.S.C. § 154(b)(1)(B)*, not merely a guarantee of 17 effective years of patent term, and do so using language separating that guarantee from a different promise of prompt administration in *subsection (A)*. The PTO's efforts to [**12] prevent windfall extensions may be reasonable -- they may even be consistent with Congress's intent -- but its interpretation must square with Congress's words. If the outcome commanded by that text is an unintended result, the problem is for Congress to remedy, not the agency.

JAMES ROBERTSON

United States District Judge